UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-05-83-B-W |
| | ) | CR-07-22-B-W |
| BARBARA JEAN PEARSON | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING ORDER

Having pleaded guilty to converting Government funds that were designated for heating oil for the low income customers of her oil business, Barbara Jean Pearson contends that the only victim to her crime was the United States Government and that the only losses the Court should consider in sentencing are the losses she caused directly to the Government. The Court rejects her contentions. It concludes that the Sentencing Guidelines concept of "victim" includes both her publicly-funded and private pay customers and that the losses to each should be considered at sentencing. In addition, although in view of her post-indictment conduct, Ms. Pearson has a significant burden to demonstrate her entitlement to a reduction under U.S.S.G. § 3E1.1(a), the Court reserves decision until the sentencing hearing on whether she qualifies for a downward adjustment based upon acceptance of responsibility.

I.  STATEMENT OF FACTS

   A.  The Criminal Charges and Guilty Pleas

On October 13, 2005, a federal grand jury indicted Barbara Jean Pearson for bankruptcy fraud, an alleged violation of 18 U.S.C. § 152(2). Specifically, the indictment charged Ms. Pearson with making a false declaration to the United States Bankruptcy Court by failing to disclose the existence of an account at a credit union. On April 24, 2007, the Government filed

an information against Ms. Pearson, charging her with converting more than $1,000.00 of government funds to her own use, an alleged violation of 18 U.S.C. § 641.[1]  The information charged Ms. Pearson with conversion of funds from the United States Department of Health and Human Services Low Income Energy Home Assistance Program (LIHEAP).  On April 24, 2007, Ms. Pearson pleaded guilty to both crimes.

### B. LIHEAP and Cold Stream Oil Company

LIHEAP is a federal program that provides heating and home energy financial assistance to low-income households.  The United States Department of Health and Human Services Administration for Children and Families administers LIHEAP and funds the program through block grants to state and tribal agencies.  In the state of Maine, the Maine State Housing Authority (MSHA) acts as the state administrator for LIHEAP; the MSHA in turn makes sub-grants to private entities and tribes.  In Penobscot County, MSHA administers LIHEAP through Penquis Community Action Program (Penquis CAP).[2]

Ms. Pearson was the Clerk and Incorporator of Cold Stream Oil Co. (Cold Stream), an oil delivery company servicing retail customers.[3]  Beginning in 1999, Cold Stream, through Ms. Pearson, signed vendor agreements with MSHA, which allowed Cold Stream to become a vendor for LIHEAP.  From September 4, 2001 through March 1, 2002, Cold Stream received over $20,000 from LIHEAP.  Under the vendor agreements and under MSHA rules, a vendor

---

[1] The indictment contained eight counts, but on April 24, 2007, Ms. Pearson pleaded guilty only to count six, the bankruptcy fraud count.  On the same day, she waived the right to indictment as to the conversion of government funds and the Government proceeded by information on that charge.  She pleaded guilty to count eight of the indictment and the single count in the information.

[2] LIHEAP provides heating assistance through four separate programs, and the MSHA administers the program via grants to private entities and tribes.  In this case, the funds were part of the Home Energy Assistance Program (HEAP) and were administered through the Penquis Community Action Program (Penquis CAP).  For the sake of clarity, the Court refers to the government funds involved as LIHEAP funds.

[3] The Court has gleaned these facts from the Presentence Investigation Report (PSR), which the Probation Office filed in this matter, and from the Prosecution Version, which the Defendant admitted when she entered her guilty pleas.

2

receiving LIHEAP money is barred from using LIHEAP funds for purposes other than providing LIHEAP benefits for authorized recipients.[4]  Cold Stream obtained its oil from C.N. Brown Company on a cash-only basis and in 2001, Cold Stream began to experience financial problems. It filed for bankruptcy protection on October 22, 2001, and after that petition was dismissed, re-filed on February 8, 2002.

Later in February 2002, the MSHA audited Cold Stream's LIHEAP accounts and determined that Cold Stream should have had $6,054.12 in unspent LIHEAP funds.  This amount could have been in the form of cash on hand, money in an account, or oil, either in storage or in a delivery truck.  If Cold Stream did not have a combination of money and oil equal to $6,054.12, it must have misrepresented financial information it provided during the audit.  Further investigation by the United States Department of Health and Human Services Office of Inspector General compared differences between Cold Stream's LIHEAP and bank records, and discovered differences that ranged between $5,000.00 on November 5, 2001, and $11,749.63 on December 3, 2001.  The audit also revealed that payments were made from Cold Stream's bank account to on-line gambling sites in the total amount of $8,808.00.

When interviewed, Ms. Pearson conceded that she had misused LIHEAP funds from Penquis CAP to buy oil for prepaid accounts and other private paying customers; Ms. Pearson also said that she had intended on replacing those funds from Cold Stream's accounts receivables.  Although the original amount charged in the indictment was $6,054.12, the company ultimately reduced the loss to the government to $4,041.40 by delivering oil to some LIHEAP clients.  However, twenty-six private pay customers who prepaid for heating oil did not receive their oil and sustained a loss of $10,553.28.  The PSR concluded that Ms. Pearson

---

[4] MSHA rules prohibit the vendor from applying LIHEAP funds to "surcharges, penalty charges, reconnection charges, clean and repair service charges, security deposits, extra delivery charges and insurance." Me. State Hous. Auth., 99 346 CMR 24-1(Y), 5(C).

3

diverted funds from a number of her private pay clients as well. Combining the maximum loss to LIHEAP and the loss to the private pay customers, the PSR calculated the total loss at $16,607.40.

### C. PSR Calculations and Ms. Pearson's Objections

Ms. Pearson now comes for sentencing. The PSR calculated Ms. Pearson's guideline sentence as follows: (1) a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2); (2) a four-level enhancement under U.S.S.G. § 2B1.1(b)(1)(C) because the loss exceeded $10,000; (3) a two-level enhancement under U.S.S.G. § 2B1.1(b)(8)(B) because the offense involved a misrepresentation or other fraudulent action during the course of bankruptcy proceedings; and, (4) a four-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B) because the instant offense involved over fifty victims. As she has a total of one Criminal History Point, Ms. Pearson's Criminal History Category is I. For a total offense level of sixteen and a Criminal History Category of I, the guideline sentencing range is twenty-one to twenty-seven months.[5]

Ms. Pearson has several quarrels with the PSR. First, she contends that the only victim of her offense was the LIHEAP program, and therefore, an upward enhancement for the number of victims under U.S.S.G. § 2B1.1(b)(2)(B) is not warranted. Second, she argues that the enhancement for amount of loss was inappropriate because the loss did not exceed $10,000. Finally, she claims that she is entitled to a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. The Court requested sentencing memoranda.

---

[5] In addition, according to the PSR, Ms. Pearson is ineligible for probation and is subject to a period of supervised release from two to three years, a fine between $5000 and $50,000, and a special assessment of $100 per Count for a total of $200. Finally, she is subject to a restitution order requiring her to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1).

## II.   DISCUSSION

### A.   Number of Victims

The United States Sentencing Guidelines provide a four-level enhancement if a property offense "involved 50 or more victims." U.S.S.G. § 2B1.1(b)(2)(C). The Application Notes define "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." *Id.* § 2B1.1 Application Note 1. Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 Application Note 3(A)(i). Apart from the United States Government, via LIHEAP, there are two potential categories of victims in this case: (1) the LIHEAP clients; and, (2) the private pay clients.

Regarding the LIHEAP clients, the Government claims that "[b]ecause Defendant converted the LIHEAP money, the LIHEAP clients were victimized by not getting the oil they were entitled to." *Government's Mem. in Aid of Sentencing* at 4-6 (Docket # 118) (*Government's Mem.*). In the Court's view, the Government is clearly correct. As Congress recognized in funding LIHEAP, the funds are for households "that pay a high proportion of household income for home energy . . . ." 42 U.S.C. § 8621. Failure of the LIHEAP provider to deliver oil can result in a lack of heating oil during a northern winter – with potentially dire consequences. In its memorandum, the Government gives examples of Cold Stream clients who were entitled to receive oil under LIHEAP, but who did not. *Government's Mem.* at 3-4. Even though it is unclear whether any LIHEAP customer actually suffered any damage because they ran out of heating oil, a number of LIHEAP clients had to scramble to purchase oil with their own limited funds. For example, LIHEAP customers used oil from their automobiles and fueled their furnaces in five gallon increments because Ms. Pearson had made off with congressionally-designated funds. *Id.* Since heating oil during the dead of a Maine winter is a manifest

5

necessity, if an oil dealer converts federal money away from low income households, the rightful recipients will have to buy it somewhere else. It was a "reasonably foreseeable pecuniary harm" that as a result of Ms. Pearson's actions these recipients had to use own resources to obtain heating oil.

Ms. Pearson's response – that the only victim of her crime was the Government – rings hollow. Although Ms. Pearson was convicted of converting funds that belong to the United States for her own use, the Sentencing Guidelines do not limit the definition of "victim" to the statutory victim. Instead, the Guideline definition of victim is "any person who sustained any part of the actual loss," and actual loss turns on whether the person has suffered "reasonably foreseeable pecuniary harm" from the criminal act. U.S.S.G. §§ 2B1.1 Application Note 1, 3(A)(i). Victim status under the sentencing guidelines is not conscribed by the statutory basis for the conviction. *See United States v. Ebbers*, 458 F.3d 110, 126-27 (2d Cir. 2006) (including losses to investors in calculating the loss under U.S.S.G. § 2B1.1 for securities fraud); *United States v. Geeslin*, 447 F.3d 408, 411 (5th Cir. 2006) (concluding that a subordinate police officer was a victim of a Police Chief's scheme to defraud a governmental entity); *United States v. Antonakopoulos*, 399 F.3d 68, 82-83 (1st Cir. 2005) (including loss sustained by a customer in calculating loss from bank fraud); *United States v. Parker*, 133 F.3d 322, 329 (5th Cir. 1998) (concluding that both the social security recipients and the Social Security Administration were victims of public bribery).

The next question – whether private pay customers are also victims – is more difficult. By definition, private pay customers could not have been the intended beneficiaries of LIHEAP. A diversion of LIHEAP funds, therefore, would not directly affect Cold Stream's private pay customers. Here, Ms. Pearson raided accounts holding the money that her pre-paying customers

had earlier remitted, leaving insufficient funds to cover already-paid-for oil deliveries later in the winter.

The Government argues, with considerable force, that the similarity between the LIHEAP and pre-payment schemes justifies the inclusion of private pay customers as victims under the relevant conduct provisions of the Guidelines. After all, Ms. Pearson simply dipped into Cold Stream's accounts, whether the money came from the government or from her private pay customers. The Government points to the provision of the Guidelines that allows the use of relevant conduct in determining specific offense characteristics. U.S.S.G. § 1B1.3(a) (stating that "[u]nless otherwise specified . . . specific offense characteristics" include relevant conduct as defined in that section). For the purposes of Ms. Pearson's sentencing, "relevant conduct" is "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." [6] *Id*. § 1B1.3(a)(2). Acts are part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.* § 1B1.3 Application Note 9.

The Government's argument is undercut, however, by its concession that none of the private pay customers fits within the statutory definition of victim for purposes of restitution. In

---

[6] Section 1B1.3(a)(2) applies to offenses "for which grouping of counts would be required under § 3D1.2(d) had the defendant been convicted of multiple counts." U.S.S.G. § 1B1.3 Application Note 3. Section 3D1.2(d) groups counts for which "the offense level is determined largely on the basis of the total amount of harm or loss . . . or some other measure of aggregate harm." U.S.S.G. § 3D1.2(d). It includes offenses under § 2B1.1, such as the property offenses committed by Ms. Pearson: "theft, embezzlement . . . and offenses involving fraud or deceit." *Id.* § 2B1.1. In this case, the fact that the Court does not have jurisdiction over Ms. Pearson's offenses against private customers is insignificant: "So long as the guidelines so intend and the necessary proof is offered, a defendant may ordinarily be punished for relevant conduct, whether or not it includes conduct for which the court lacks independent jurisdiction to try the defendant." *United States v. Dolloph*, 75 F.3d 35, 40 (1st Cir. 1996); *United States v. Ahmad*, 202 F.3d 588, 591 (2nd Cir. 2000) (finding that if conduct may only be charged as a state crime, but "would have been a federal offense but for lack of a jurisdictional element such as transportation across state lines," then it can be included under § 1B1.3(a)(2)). Even applying the Second Circuit's narrowing of "relevant conduct," Ms. Pearson's use of private customers' money would be punishable under federal law, 18 U.S.C. § 2315, had it included the jurisdictional requirements, allowing its inclusion under § 2B1.1.

contrast with the "relevant conduct" standard under the Sentencing Guidelines, under the restitution statute, the offense for which a person is considered a victim includes only the charged offense; this definition is broadened only for offenses that include as an element "a scheme, conspiracy, or pattern of criminal activity.". 18 U.S.C. § 3663A(a)(2). *See, e.g.*, *United States v. Hensley*, 91 F.3d 274, 276 (1st Cir. 1996) (regarding mail and wire fraud, for which a scheme to defraud is an element of the crime); *United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996) (finding that "felon in possession" does not require proof of such a scheme). In view of the differences between the statutory requirements for restitution and the Sentencing Guidelines, the Government acknowledges that the losses to private pay customers are "not included" for restitution purposes. *Government's Mem.* at 4. Although it is not inconceivable that a person could be a victim of a crime under the Sentencing Guidelines, but not under the restitution provisions of the statute, this result is counterintuitive and its policy obscure. The First Circuit has explained that "[t]he purpose of restitution is to secure to an identifiable victim who has been directly and proximately harmed the pecuniary loss he or she has suffered." *United States v. Cornier-Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004). Why, in view of this salutary purpose, the range of victims would be narrowed for restitution, but broadened for punishment is unclear.

    This remains a close issue. Ms. Pearson's best argument is that her theft of the private pay customers' funds is different in kind from converting government funds. Her theft of private individuals' money, though deplorable, does not carry the same implications as her conversion of taxpayer money for the poor. Standing alone, her invasion and diversion of her private customers' funds would not be a matter of federal magnitude and would be punishable under state law. Further, the essence of a violation of 18 U.S.C. § 641 is "that a 'thing of value of the

8

United States' has been knowingly received, concealed or retained by the accused with improper intent . . . ." *United States v. Torres Santiago*, 729 F.2d 38, 40 (1st Cir. 1984) (quoting 18 U.S.C. § 641); *United States v. Forcellati*, 610 F.2d 25, 30 (1st Cir. 1979) (stating that the Government must prove that "a property interest of the United States was invaded.").

Nevertheless, the Court concludes that Ms. Pearson's actions in defrauding her private pay customers were either part of a common scheme or plan or part of the same course of conduct under § 1B1.3(a)(2). For the "common scheme or plan" analysis, the Guidelines point to a variety of factors: common victims, common accomplices, common purpose, or similar *modus operandi*. U.S.S.G. at § 1B1.3 Application Note 9(A). Here, Ms. Pearson's victims were similar; she had no accomplices; her actions had a common purpose; and she engaged in a similar *modus operandi*. She committed these improper actions during the same time span and took the private and public funds from the same Cold Stream accounts. She indiscriminately took money from those accounts to use for personal gain, disposing of the private and public funds in the same way. The harm she inflicted on LIHEAP and private customers was the same and related – neither ever received the heating oil Cold Stream had been paid to deliver. Based upon this evidence, Ms. Pearson's treatment of private pay customers' funds and her conversion of federal funds was part of a common scheme of plan. U.S.S.G. § 1B1.3(a)(2).

Further, Ms. Pearson's actions fulfill the alternative standard of the "same course of conduct." *Id.* This standard is whether the offenses are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* § 1B1.3 Application Note 9(B). The Guidelines set forth the following factors: "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* Here, Ms. Pearson's actions against both her private pay and

9

LIHEAP customers were identical, but for the source of the converted funds. The sole difference between the two groups of customers was the happenstance that for one group the source of the money was United States taxpayers and for the other group, it was not. Otherwise, Ms. Pearson's actions were interchangeable. The Court concludes the thefts from private pay and LIHEAP customers alike were part of the same course of conduct.

Ultimately, the relevant conduct provision of the Guidelines reflects the commonsensical notion that a defendant's criminal conduct should not be viewed in isolation. Here, Ms. Pearson robbed Peter to pay Paul. For purposes of federal jurisdiction, it is crucial that for some thefts, the money was federal money. But for sentencing purposes, thefts of non-federal money during the same period and using the same scheme are also relevant. It would be illogical for a sentencing court to ignore the fact that this same Defendant, using the same methods during the same time, defrauded a large number of her business's customers by converting their own funds for the same purposes, and it is only logical that § 1B1.3 allows the Court to consider such relevant conduct in evaluating the nature of the Defendant's crime and the severity of her sentence. The Court, thus, concludes that Ms. Pearson's use of private customers' funds is relevant conduct to the offense in question and the Court will include the number of private customer victims in its sentencing guidelines calculations.

      **B.    Amount of Loss**

The United States Sentencing Guidelines provide a four-level enhancement for a property crime if the loss is more than $10,000 but less than $30,000. U.S.S.G. § 2B1.1(b)(1)(C). The PSR concluded that the loss equaled $16,607.40, of which $10,553.28 was to private pay customers, and recommended the four-level enhancement. Ms. Pearson asserts that "the Court should reject the sentencing enhancement proposed pursuant to U.S.S.G. § 2B1.1(b)(1)(C) . . . .

Defendant stands convicted of Conversion of Federal Funds . . . . [and] was not convicted of taking any money from the 'private pay' customers." *Def.'s Mem.* at 4. She further claims that the "actual loss" in question was $4,041.40, not $6,054.12, because the actual, final loss to the Government was the lower figure. *Id.*

The amount of loss is governed by the same section of the Sentencing Guidelines as the number of victims. As such, the analysis regarding which acts and omissions should be included in the "offense" for sentencing purposes is the same as the private victim analysis. Having found that Ms. Pearson's actions concerning private customers are "relevant conduct," the Court concludes that under § 1B1.3 the losses to private customers are included for sentencing purposes. Because the private customers are included in the amount of loss analysis, there is no need to resolve whether the higher or lower figure for the government's loss applies. Either way, Ms. Pearson caused a total loss between $10,000 and $30,000, therefore, subsection (C) of § 2B1.1(b)(1) applies.

### C.     Acceptance of Responsibility

The PSR does not recommend a downward adjustment based on Ms. Pearson's acceptance of responsibility under § 3E1.1. The government states that Ms. Pearson's pre- and post-plea behavior bars any such reduction. Ms. Pearson responds that "[h]er guilty plea should suffice in this regard." *Def.'s Mem.* at 5.

Though Ms. Pearson pleaded guilty prior to the commencement of trial and such a plea "will constitute significant evidence of acceptance of responsibility . . . . [T]his evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1 Application Note 3. In addition to the Defendant's plea, the Court may consider evidence regarding her actions, including her behavior both before and after

11

the guilty plea, such as violations of pretrial release and subsequent criminal conduct. *Id.* § 3E1.1 Application Note 1; *United States v. Robinson*, 433 F.3d 31, 38 (1st Cir. 2005); *United States v. Burdi*, 414 F.3d 216, 220-21 (1st Cir. 2005); *United States v. McLaughlin*, 378 F.3d 35, 38-9 (1st Cir. 2004) (holding that the court has "the right to consider [defendant's] exogenous pre-plea conduct in denying him an acceptance-of-responsibility discount"); *United States v. Hurd*, 486 F. Supp. 2d 54, 58 (D. Me. 2007). Further, the defendant bears the burden of demonstrating acceptance of responsibility. *Id.* § 3E1.1(a).

The PSR lists five separate incidents since her indictment involving Ms. Pearson's alleged use of alcohol or drugs.[7] Noting that the Magistrate Judge had rejected significant portions of her testimony at a suppression hearing, the Government also contends that Ms. Pearson's testimony during a suppression hearing justifies denial of acceptance. In addition, Ms. Pearson did not plead guilty until two days before the trial date.

The Court will not rule finally, based on this record alone, whether Ms. Pearson has demonstrated her right to a two-level reduction for acceptance of responsibility under § 3E1.1(a). However, the Court notes that, in view of the history of this case and Ms. Pearson's post-indictment conduct, she bears a considerable burden. *See McLaughlin*, 378 F.3d at 41-42 (upholding denial of acceptance where defendant drove under the influence of alcohol and possessed heroin while on pretrial release). As the Court has previously written, "a denial of

---

[7] Ms. Pearson was indicted on October 13, 2005, and was released on personal recognizance bail. She was arrested on November 16, 2005 for Operating Under the Influence and Domestic Assault. The Domestic Assault charge was later dismissed, but on March 8, 2006, Ms. Pearson pleaded guilty to the Operation Under the Influence charge and was sentenced to five days in jail and an $800.00 fine. After this incident, she was released, and tested positive for marijuana in a random urinalysis. On August 10, 2006, she was arrested for Operating Under the Influence and Operating After Suspension; these charges remain pending. Her bail was revoked on August 16, 2006; while in jail on October 9, 2006, she was found in inappropriate possession of Zanax, Suboxone, and Clonopin. Ms. Pearson entered guilty pleas to the federal charges on April 23, 2007. On June 9, 2007, while in the Cumberland County Jail, Ms. Pearson was seen snorting something in her cell and was observed with a white powdery substance in her nostrils. Though Ms. Pearson denied snorting pills, a later urinalysis confirmed the presence of Suboxone, cocaine, methamphetamine, and amphetamine.

acceptance based on subsequent criminal conduct would be consistent with First Circuit case law and with the Court's rulings on similar cases." *Hurd*, 486 F. Supp. 2d at 58. To allow Ms. Pearson to present any further evidence she deems appropriate and to marshal her argument on this issue, the Court will defer ruling on this issue until the sentencing hearing.

### III.    CONCLUSION

The Court concludes that Ms. Pearson's offense involved over fifty victims, resulting in a four-level increase under U.S.S.G. § 2B1.1(b)(2)(B), and that the loss exceed $10,000, but was less than $30,000, resulting in a four-level increase under U.S.S.G. 2B1.1(b)(1)(C). It defers ruling until sentencing on whether she is entitled to a two-level reduction under U.S.S.G. § 3E1.1(a).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 14th day of November, 2007